Pasman *v.* Montague.

JOHN L. PASMAN

*v.*

EBENEZER MONTAGUE.

A complainant alleged that he was induced to execute certain deeds, by the false representations of the defendants, and also through his own ignorance of the fact that the lands had been owned by his mother, and devised by her to him. The evidence utterly failed to substantiate the bill.—*Held*, that he could not be allowed to change his position and claim relief on the ground that, although he voluntarily executed the deeds to the defendants, he did so under a mistake as to the extent of his interest in the lands conveyed.

Bill for relief.   On final hearing on pleadings and proofs.

*Mr. F. McGee* and *Mr. J. D. Bedle,* for complainant.

*Mr. W. B. Williams,* for defendant.

THE CHANCELLOR.

The complainant, by his bill, seeks relief against the consequences of fraud, which he alleges the defendant practiced upon him in reference to certain real estate, in what was formerly Hudson City (now Jersey City), in the county of Hudson, of which the complainant's mother, Catharine Pasman, died seized. She died on the 14th of March, 1852.

She had obtained the title to the property from Montague (who was her son-in-law), by deed dated April 22d, 1842, by which he conveyed it to her for the consideration of $5,500, subject to a mortgage of $5,000 upon it; the amount of which was computed and allowed to her as so much of the consideration, and the payment of which she assumed. Montague became the owner of the property in August, 1840. According to the deed, as well as the other evidence in the cause, she gave but $500 above the amount of the mortgage for the property. Montague swears that he himself paid off the mortgage after the conveyance to her was made. She, by her will, dated October 28th, 1850, gave half of her estate, real and personal, to her daughter, Amelia Ellen, wife of Montague, and the other half to the complainant, and appointed the complainant executor. The will was proved before the surrogate of Hudson county, on the 10th of April, 1852, about a month after her death. She conveyed away part of the property, about ten lots, in 1848 and 1850. After her death, and on the 8th of July, 1852, Montague and the complainant, with their wives, conveyed part of the property to Justus and Horace M. Smith, for the consideration of $8,000. To secure the purchase-money and $2,000 besides, lent to them by Montague to enable them to build on the property, the Smiths gave a mortgage on the premises to the complainant, of the same date as the deed. The complainant assigned the mortgage to Montague by assignment dated the 25th of July, 1852, and recorded on the 20th of October, 1855.

On the 25th of March, 1853, Montague and the complainant, with their wives, conveyed another part of the property to the mayor and common council of Jersey City, for the consideration of $1,200, which was paid to and retained by Montague.

On the 8th of April, 1854, the complainant and his wife conveyed to Richard Morrell, William O. Davey, Isaac J. Vanderbeck and Benjamin Mills, the undivided half of another part (fifteen and one-fifth acres) of the property, for

the consideration of $19,000 as expressed in the deed. Montague and his wife conveyed to them the other half. The grantees gave a mortgage to the complainant and Montague, of the same date as the deed, for $21,735 and interest, on account of the purchase-money.

On the 10th of April, 1854, two days after the date of the deed, Pasman assigned the mortgage to Montague for the consideration of $10,687.50, as expressed in the assignment. The assignment was acknowledged on the 11th and recorded on the 12th day of the same month of April. By a sealed instrument of the same date with the deed, the grantees in the deed released the complainant from the covenants in the deed, except the covenant of warranty, as to which they declared that its only effect was to be the estoppel and bar created thereby, and to transfer any estate or title which he or his heirs or assigns might thereafter acquire, and transfer it to them or their heirs or assigns, and the complainant covenanted with them that a judgment of $10,357.66, recovered by one Charles Hallock, in the supreme court of this state, in 1843, against Montague, but then held by the complainant by assignment, should not be a lien on any part of the property. The instrument contained the following recital :

" And whereas, by an arrangement between said John L. Pasman and the other parties, conveying the other undivided moiety of the said land hereinbefore described, the said John L. Pasman was to take for his share of the whole tracts of land devised by Catharine Pasman, deceased, to him and Amelia Ellen, wife of Ebenezer Montague, other lands than those conveyed to said Morrell, Davey, Mills and Vanderbeck, and is to assign to Ebenezer Montague the purchase-money mortgage given by said Morrell, Davey, Mills and Vanderbeck, and ought not to be liable upon the covenants contained in his deed hereinbefore recited."

The instrument was signed by Morrell and his associates, and by the complainant.

By deed dated the 10th of April, 1854 (the same date as the last-mentioned deed), the complainant, for the consider-

ation of $20,000 as expressed in the deed, conveyed to Montague " all those lands situate on the east side of Palisade avenue, in the township of North Bergen, in the county of Hudson and the state of New Jersey, which was devised to the said John L. Pasman by the will of Catharine Pasman, deceased, and also a certain parcel of land situate on the west side of Palisade avenue—bounded on the east by Palisade avenue; on the north and west by land of William O. Davey, Benjamin Mills, Richard Morrell and Isaac I. Vanderbeck; on the south by land of Nathaniel Orr; excepting out of the land so devised by Catharine Pasman to John L. Pasman, so much as he has heretofore conveyed." This deed conveyed all the rest of the property. It was acknowledged on the 10th of April, 1854, the day of its date, and was recorded on the 16th of November, 1859.

The complainant's bill was filed on the 23d of May, 1876, nearly twenty-two years after the making of the last-mentioned deed. It states that the complainant never heard, until January, 1874, when the fact was stated to him by one of the witnesses to the will, in a casual conversation, that his mother had left a will, and that he did not know until 1876 what the contents of the will were, nor that she had left any real estate. It states that the complainant was induced to sign the before-mentioned deeds (except the deed to Montague, which it declares is a forgery), solely by his confidence in the statement of Montague and his wife to him; that the former had conveyed his land to him to put it out of the reach of his creditors, and his consequent belief that in making the conveyance, he was merely conveying property of which he had the legal title, through conveyance by Montague to him, but of which the former was the real owner. He prays that Montague may be decreed to be a trustee for him of his share of the proceeds of the lands which have been conveyed, and to account to him in the premises, and that the deed of April 10th, 1854, to Montague may be set aside.

The case made by the bill is not sustained by the proof. In view of the deeds of conveyance executed by him, and especially of the statements contained in the deed of April 10th, 1854, from the complainant to Montague, and the recital in the instrument before mentioned, executed by Morrell, Davey, Mills and Vanderbeck, and the complainant, there can be no doubt that the complainant not only did not act, in conveying the property, under the belief that he was conveying land which had been conveyed to him by Montague, but that he did know of the existence of his mother's will. That will, as before stated, was proved within a month from the time of her death. It was proved before the surrogate of Hudson county, and by the oath of a witness who was not a member of the family. There is no evidence of concealment of the existence or proof of the will. That letters testamentary were not taken out upon it, was probably due to the fact that it was understood that the testatrix, in fact, left no estate. The deeds to the Smiths, and to the mayor and common council of Jersey City, were executed, not by him and his wife alone, as they would have been had the title been in him alone, but by Montague and his wife also. The deed from the complainant to Morrell and his associates was for an undivided half only, Montague and his wife conveying the other half by another deed. The instrument of writing executed by Morrell and his associates, and the complainant, explicitly stated the fact that the latter derived his title to the property through his mother's will.

The deed to Montague expressly conveys, by a description which not only refers to the will, but refers to it in such a way as that the contents of the conveyance could not have been made known to the complainant without disclosing the fact that the land thereby conveyed had been devised to him by his mother's will. It is insisted, indeed, on his behalf, that so much of the recital in the instrument in writing, executed by Morrell and his associates, and the complainant, as alleged that an arrangement existed by

which the complainant was to be compensated for his interest in the lands conveyed, was false. That circumstance, however, only makes the evidence of notice to the complainant more clear, for the complainant, by the recital to which he put his hand and seal, not only knew that the title which he conveyed was derived through his mother's will, but that it was a title of absolute and beneficial ownership, and he could not have been deceived as to his rights when they were declared in full, and his compensation for his relinquishment of them was stated. If the statement as to compensation was untrue, it was so to his knowledge then, and he subscribed to it, probably, for the purpose of concealing the fact that his ownership was, in fact, understood by him to be morally merely legal and not beneficial.

Though the complainant says, and swears, that the deed to Montague is a forgery, the proof is clear to the contrary. The deed was drawn by Robert Gilchrist, who was employed by Morrell and his associates to guard their interests in the conveyance to them, and the acknowledgment was taken by him, as one of the masters of this court. Montague swears that Mr. Gilchrist required that the complainant should be identified, and he says the latter brought to him, accordingly, a person whom he knew. He says: " Mr. Gilchrist told him (the complainant) that it was necessary to have somebody to identify him. Pasman stepped out and brought in a man; I think his name was Shaw or Young; in a bookstore, I think; with whom he told Mr. Gilchrist he was acquainted, before going, and Mr. Gilchrist told him to fetch the man in, as he was acquainted with him; I did not know the man." It appears, by the testimony of Robert B. Kashow, that he kept a book-store in Jersey City at that time; that there was no other person of the name of Kashow or Shaw then living or doing business in Jersey City, and that he then had in his employ a man by the name of Young. Mr. Gilchrist not only took the acknowledgment, but he witnessed the signature of the complainant. He appears to have been careful to be satisfied of the

identity of the complainant. Both he and Mr. Mills recognize him. ·

And, further, the complainant admits that, on the same 10th day of April, 1854, he signed the deed to Morrell and his associates. It was signed in the .presence of Mr. Gilchrist, and the acknowledgment was taken by him. Beyond dispute the complainant signed and acknowledged the deed to Montague. More than twenty years elapsed after the final transaction between the parties in reference to the property and the commencement of this suit. It is not surprising that the complainant's memory is at fault in regard to it.

It appears probable that the conveyance by Montague to his mother-in-law was merely a cover to protect the property from his creditors. He was about to apply for the benefit of the bankrupt law. For all the consideration ($500) above the mortgage on the property, she gave to him her note, which does not appear to have been ever paid. She does not appear to have had any property. So far as the complainant knew, and, as he believed, and as appears, she was dependent on Montague for her support. He paid the taxes and assessments on the property, and it appears to have been understood that the property was his, in fact. The will was probably the means devised by which to secure to Montague the property after her death. That he was not in a condition to take the title himself safely is evident from the fact of the existence of the Hallock judgment before mentioned, which was recovered against him in 1843, for more than $10,000. That the complainant knowingly took the title to other land belonging to Montague, appears from his own testimony. At the request of his sister, Mrs. Montague, he bought property in Illinois for Montague; took the title, and subsequently conveyed it by his direction. From the instrument of writing executed by Morrell and his associates, and the complainant, before referred to, it appears that when that instrument was executed the complainant held, by assignment, the Hallock judgment. That

he was not ignorant of business also appears from his testimony. He bought and sold land on his own account in New York. He has owned three houses and lots in the city of New York, bought at different times, and sold by him, and owns a farm which he purchased in Orange county, in the state of New York.

The complainant regards as very important evidence in the cause, the fact that Montague gave him, as a gratutity (the complainant insists that it was "conscience-money"), the sum of $1,800, in the year 1870. Montague swears that the complainant, on that occasion, applied to him and requested him to take an assignment of a mortgage for $1,800 which was on his farm, the holder of which was pressing him for the money, and that he, while unwilling to take the mortgage, was disposed to relieve him in consideration of his honorable conduct towards him in the transactions which are under consideration in this suit. He says that the complainant accounted for the existence of the mortgage by saying that his son had been in some speculation, and that he had had to mortgage his farm for $1,800.

The complainant, in his testimony, to the question asked on cross-examination, "How did that mortgage" (the mortgage on his farm) "come to be made?" answered, "I raised the money for a particular purpose." When asked "What purpose?" he replied, "I don't know as it is necessary to tell what I did with the money." He was then asked, "Was it to help your son?" and he answered, "I wanted it for different purposes." To the further question, "Was that one of them?" he replied, "I may have given him some money, too." While he admits that he applied to Montague to take an assignment of the mortgage, he says it was not on the occasion when Montague gave him the money. When asked, in that connection, what period of time there was between the two transactions, he replied, "Probably the mortgage was presented and the business was all settled before we had the other occurrence." His testimony on this point is so unsatisfactory as to deprive the

Pasman *v.* Montague.

fact that Montague gave him $1,800, on which he placed so much reliance, of any significance whatever.

But his counsel insist that, if the proof will not sustain the charge of fraud, relief may be accorded to him on the ground of mistake; that is, on the ground that he did not know that his mother had left a will or had died seized of any land. But the same facts which disprove the allegation of fraud, on which his bill is based, equally disprove any allegation of mistake. And again, his bill is based on the allegation that he was induced to execute the deeds, which he admits having executed, by the representations of Montague and his wife; that the former had conveyed the property to him, and that he did not know of the existence of his mother's will or of her ownership of the property at her death. He cannot be permitted, now that the proof utterly fails to substantiate the allegations of his bill, to change his position and place his claim to relief on the ground that, though he voluntarily executed the deeds without the inducement of false representation, and with full knowledge of his mother's will and of her ownership of the property at her death, he did so under a misapprehension on his part as to the character of his ownership, that it was beneficial as well as legal. *Midmer* v. *Midmer's ex'rs*, 12 *C. E. Gr.* 548; *Hoyt* v. *Hoyt, Id.* 399; *Brantingham* v. *Brantingham*, 1 *Beas.* 160; *Fenaby* v. *Hobson*, 2 *Phil.* 255; *Hixson* v. *Lombard, L. R.* (1 *H. L.*) 324; *Glascott* v. *Lang*, 2 *Phil.* 315; *Montesquieu* v. *Sandys*, 18 *Ves.* 302; *Wilde* v. *Gibson*, 1 *H. L. Rep. Cas.* 605; *Archbold* v. *Commissioners &c.*, 2 *Id.* 440, 460.

The bill will be dismissed, with costs.